Ruffin', Chief Justice,
 

 having stated the case as above, proceeded: — Independent of any agreement, the case is
 
 *194
 
 the ordinary one of a bequest of slaves, as parts of a general residue, to one for life, and then over; in which it becomes necessary, after applying all the rest of the estate, to raise money from the slaves to satisfy a part of the debts. The question is, in what proportion the different interests are to contribute, and how those proportions are to be raised ?
 

 As between the legatee for life, and him in remainder, a residue of personalty other than slaves, must be sold by the executor, and the proceeds invested so as to give the life-owner the interest, keeping the principal ibr the remainderman.
 

 But this rule does not apply to a residue of slaves. They are not to be sold by the executor, but must be delivered
 
 in specie
 
 to the legatee for life, who is entitled to their profits during his time, after which, they and their increase go to him in remainder.
 

 The general rule is, necessarily, that the executor must sell the residue, and pay the debts out of the proceeds. That sinks so much of the capital, and does equal justice to each class of the legatees. Only what remains after payment of debts, is given away; and that surplus is invested so as to yield a profit, which is the legacy to the tenant for life; and the principal is secured to those entitled in remainder.
 

 But in
 
 Smith
 
 v.
 
 Borham,
 
 2 Dev. Eq. Ca. 420, it was determined, that in reference to the right, of such legatees, as between themselves, slaves form an exception to that rule. The executor is not obliged, nor generally permitted to sell them. He is not, merely for the sake of the convenience, or interest, or security of the first or last takers. Slaves have always been considered
 
 “
 
 unperishable goods,” within the acts of 1715 and 1723, and when forming a part of the estate of an intestate, are not sold, but divided specifically amongst the next of kin,unless a sale be necessary to the payment of debts, or an equal division. They have been viewed in the same light, when they form a part of a general residue bequeathed ; whether the bequest was immediate, or for a particular time, to one and then to another. The legatee of the particular estate is not merely to have the interest upon the value, but is entitled to the possession of the slaves ; and where the interest upon the value would be more than the profit from the possession— as it may be, if the slaves be mostly females, having children — the first taker cannot require a sale, because the remainderman is likewise entitled to the slaves themselves in his turn. From an early period, the reduction in the value of the original, stock, has in this state been compensated to the remainderman by giving him the increase. That is settled doctrine.
 
 Erwin
 
 v.
 
 Kilpatrick,
 
 3 Hawks,
 
 *195
 
 456. Indeed, the principle was incorporated into our law by statute. The act of 1784,
 
 (Rev. ch.
 
 225,) gave that part of the distributive share of a widow, which consists of slaves, for life only; and required her to give bond for the return, upon her death, of the slaves and their increase to the administrator of her husband.
 

 The cases of
 
 Smith
 
 v.
 
 Borham,
 
 2 Dev. Eq. Ca. 420, and
 
 Erwin
 
 v.
 
 Kilpat-
 
 rick, 3 Hawks, 456, approved.
 

 In effect slaves given in a residue and unsold, stand as between the legatees for life, and in remainder,
 
 *196
 
 upon the footing of s specificgift, Where given in either way, the executor may sell for debts; the difference as to his duties and powers being that in the latter case, he ought to apply to the respective legatees for contribution before a sale, and in the former he need not, because the gift is only of so many of the slaves as may remain in clear surplus.
 

 
 *195
 
 Yet there is no doubt, that an executor may sell slaves thus bequeathed, for the payment of debts; and generally he ought to do so. Then each interest certainly bears a due share of the common burden. But if he does not sell, he canqot keep them and pay the debts out of the first profits. That would throw the whole burden on the first taker. Nor does it seem just, where — the gift not being specific — the subject yields large immediate profits, but is wearing out daily, to give all those profits to the tenant for life, and only require that person to keep down the interest on the debts, or ultimately, to pay the principal, with the remainderman, in proportion to the original values of their interests, estimated as of the time they vested. That might throw on the remainderman the larger part of the debts, although his legacy were the less valuable when it fell into possession. Hence, the rule in England seems to be, as to a leasehold given in a residue, that the tenant for life is not entitled to the annual produce, but only to interest on the estimated value at the death of the testator; for the term is expiring while it is producing.
 
 Fearns
 
 v.
 
 Young,
 
 9 Ves. 552. Families of slaves, however, differ from leaseholds in this respect, as before mentioned. Their value does not ordinarily diminish, but increases. The tenant for life is bound to provide for, and preserve the issue; and therefore, is allowed to have possession, .and consequently the whole profit during the life-estate. In effect then, slaves given in a residue and unsold, stand, as between the legatees, upon the footing of a specific gift. When given in either way, the executor may sell for debts; the difference as to his duties and powers being, that in the latter case he ought to apply to the respective legatees for contribution before a sale; and in the former he need not, because the gift is only of so many of the slaves as may remain in clear surplus.
 
 *196
 
 But if the executor do not sell, that cannot affect the rights of the legatees as between themselves; nor render the executor liable, unless his neglect has produced loss to all or some of the legatees. Where no sale has been made, each legatee is entitled to the profits during his time, and must pay what would have been taken out of his share, by a sale! as nearly as it can be computed. That result would be reached by requiring the tenant for life to keep down the interest, or by charging each with the principal in proportion to the value of the particular and general estates. Which of those rules would be the proper one, it is unnecessary in this case to say, because the parties have adopted the latter for themselves by agreement, in case the remaindermen are liable to contribute at all, and the case is therefore not open to inquiries which might be deemed by the Court material to the judicial determination of the question.
 

 As the profits during Mrs. Rhodes’ life belonged, in the opinion of the Court, entirely to her, no reason is perceived why the plaintiffs should get the negroes exempt altogether from charge. Although the executor did not sell, as he might have done, yet he never delivered over the slaves, but kept them, as executor, for the purpose of paying the debts. The executor is accountable to the administratix of the tenant for life, for those profits, and must pay such part of them as is over and above her just proportion of the debts. No injury is done to the plaintiffs, by allowing him to reimburse himself out of their share, to the extent of their proportion of the debts. Possibly they m.ight have been injured by the conduct of the executor, but if so, it does not appear. These slaves are all males. They might have died or become old and of little value. But that cannot be taken for granted. They might also have been young and growing, or the price may have become better. At any rate, the shortness of the period between the deaths of the testator and his widow, renders it probable, that no material change of value took place and that no actual injury arose to these parties. The hill is framed on the idea of the risks the plaintiffs were made to run, and not
 
 *197
 
 'on that of loss. Because the executor did not sell during the life of the widow, they say he cannot do so now, nor keep any part of the/subsequent profits: since by death the plaintiffs might have lost the subject altogether. That would be strange: for even against creditors, the property is changed and becomes that of the executor by payment' of débts to the value. If a negro had died, or a loss had occurred by other accidents, it might have been debated whether the executor had not made'the property his own by not selling after a known necessity, so as to throw the loss on him. But this case presents no such question. There is no effort to impose on the remainder any other burden than that with which it was originally chargeable. The plaintiffs say it is discharged. • But they show no reason for it, unless it be found in the consent of the widow, as stated in the case.
 

 That consent seems to avail nothing to that purpose, under the circumstances. If she had intended a gift of her profits, and that were clearly proved; or if she had' agreed with the executor on behalf of the remaindermen to apply her profits to the debts and had accepted the slaves without an account, and without taking an assignment of the securities; or even if there had been long delay and her life had exhausted the value of the property; there might have been some ground to insist on the exoneration of the plaintiffs. But what actually took place amounts to no more than simply not insisting ornan immediate assent of the executors, and delivery of the slaves to her. She preferred that her share of the debts should be paid out of her profits, rather than have a sale. To effect that, she allowed the executor to retain them until he had received enough to pay all the debts, and did pay them. But that, without other evidence of the intent, does not constitute a gift of her profits, beyond her share of the charge, to those who were to take after her. It is true, she might have been under a difficulty in getting the negroes without payment by herself, or the remaindermen of the whole sum; because, the executor was not bound to part from the property until he had been fully indemnified. But she might
 
 *198
 
 expect the remaindermen to pay their shares also without a sale; or she might intend to take an assignment of the debts or of the executor’s claim. She had not accepted the slaves, with such a renunciation of her- rights. There has been no settlement, and no delivery of the slaves. The executor still retained them in that character, with full authority to make each share liable for its proper original burden. There is therefore no ground of presumption, that the widow or executor regarded the remainder as discharged; much less that the former had agreed that her money should discharge it, considering the debts as her own.
 

 The Court is therefore of opinion, that so much of the decree as is appealed from, is erroneous, and must be reversed with costs in this Court; and that it should be declared that the plaintiffs have no right to the sum of three hundred and twenty-five dollars four cents, with interest from the 20th March, 1832, part of the moneys found to be in the hands of the defendant Picot; and that said defendant ought to retain the same for the benefit of the other defendant, the administratrix of the legatee for life.
 

 Per Cuiuam. Decree reversed.